With that, we'll move to our second case of this morning. I understand it will be argued here in the courtroom, not remotely. Case number 21-1152, Scaife v. the United States Department of Veterans Affairs. Yeah, Mr. Allman, when you're ready. May it please the court, counsel, I am Joseph Allman. I represent Elaine Scaife in her appeal today, and it's my honor and privilege to do so. The decision on summary judgment to dismiss her complete complaint is an error in all counts. Elaine Scaife was the only job classifier at the Indianapolis VA Medical Center for some time. She recently, in 2016, got a helper, but she is the one person that classifies all positions at the facility. She classified a police officer criminal investigator job in February, or January or February of 16, and did not give it a two labor grade increase that the police chief of the VA wanted it to receive. In September of that year, she hears from her friend in the VA, that did you hear what the chief of police called you? She hadn't heard. She was informed by her friend, the terrible epithet, which is, I won't say it, it's on pages six and seven of our brief, exactly what he said, when the chief of captain asked him, what about my increase? And the police chief said, it's that stupid effing N-word. That's what she does, she likes to F with people. Now, she didn't know that was said in February until September. But the touchstone, one of the cornerstone principles in Title VII, law of course is totality of the circumstances. She learned about this, she had a September of 2016 that no one should have. She heard this statement, she went to the police captain and talked to him, he told her exactly what was said. And this also is part of the contextual background of why this was a hostile work environment for her. There were other incidents within the police department that were raised at the same time. There was an administrative investigative board convened to hear these charges of racism. She has to be part of it, she wasn't allowed to be. And then finally, nothing was done to the police chief, nothing happened as a result of it. And those that heard testimony that the police chief dropped the N-word on numerous occasions, they were found by the board to have some ax to grind. And the police witnesses who were testified that they hadn't heard anything, didn't hear anything like that, they were found to be more credible because they all had the same story, please. This was devastating to Elaine Scaife when she heard this. And part of Judge Pratt's decision is erroneous because she finds that, she analyzed that separately from this gender discrimination that was going on at the same time. Ms. Scaife worked for a male and he was very abusive to women, had been known to be abusive to women. We have testimony from people that worked at the Danville, Illinois VA Medical Center. Gentleman was abusive. He liked to get up in women's faces and get real close to them, especially if they challenged his decisions. He was getting ready to leave. Not just women, right? I mean, doesn't the record show that Mr. Earp had a bit of a temper or was prone to fly off the handle in the workplace with all sorts of folks, men and women alike? Your Honor, there is only testimony of one example of him yelling at a man one time. I would respectfully argue that does not make him an equal opportunity harasser. There was a man, a male came in and worked in the job classifying department with Elaine, they were in human resources. There was a male that came in and worked and Mr. Earp tiptoed around the gentleman. The gentleman made errors in his work.  and correct the mistakes. But he wants to browbeat Elaine Scaife into giving his friend a labor grade increase on his way out. Mr. Earp's getting ready to go. But does that have to do with her sex or does that have to do with the fact that, if the male counterpart would have done it, would he have treated him similarly? I think the evidence in the record is that he treated everybody in the same boorish sort of way if he didn't get what he wanted. He was, he didn't do it necessarily because she was a woman. Your Honor, in this regard, he only asked her to do this. We have testimony from the national office that it is a criminal act or is part of the waste, fraud and abuse in the federal government. But what does that have to do with her sex? That's right, I'm hung up on that. Well, what it has to do is, she's the only person that he asked to do it. He could have done it himself. Didn't she testify that at that time he supervised three people, Ms. Scaife, another woman named Ms. Corpo, who was also a black woman, and then a man, I don't know his race, Mr. Rose. So is it your position he asked Ms. Scaife to do this classifying instead of Ms. Corpo and Mr. Rose and those were his other two alternatives? Yes, and there's another, there's a male in the Fort Wayne, Northern Indiana VA Medical Center classifier. How do you get around the fact that he did not also ask Ms. Corpo, who's another black woman? My client is the best. My client may have been the only one capable of doing that work. Then are we to infer that's why he asked her? Well, why didn't he do it himself? He didn't do it himself. He didn't ask the classifier in Fort Wayne to do it, who is a male. And that's why I'm, under the McDonnell-Douglas framework, that's why I'm saying that it's gender-based discrimination. Could you also address why you said not long ago that the district court separately analyzed Ms. Scaife's race and gender claims rather than viewing them together when there does appear to be a part of the opinion where she looks at them together and says, even in the aggregate, there's no claim here. Well, it seems to me it was more piecemealed and looked at them completely separately. This September of 2016, all this is going on at the same time for Elaine Scaife. And as well, she's written up by the human resource officer, who's her boss's boss, for actions involving her refusal to break the law, Your Honor. I'm not sure I would characterize that. It seems like she was written up for her judgment. It didn't seem to me, at least when I read the record, that the human resources manager was chastising her for failing to break the law or not doing the rating the way Mr. Earp was. It seemed to me that she was chastising her for exercising poor judgment and text messaging her when she knew her boss was tied up with other things and out of town. And by the way, it had no effect whatsoever. I think that it had absolutely zero effect on her job, right, I mean, that's... Well, and I make this point in my brief, my written argument, it doesn't have to. It doesn't have to have an effect. It doesn't have to be an adverse employment action? It has to be a severe or pervasive action. It seems to me that, so she couldn't, the human resources manager, under your theory, the law couldn't respond at all except to say, I agree. Anything else would have been an adverse employment action according to the way you interpret the law, at least the way I read your argument. You can't say to an employee, this is not the correct way to go about this, that's violation of the law. Well, the, you texted me, seems like much to do about nothing from our standpoint. I mean, this is summary judgment, right? So, I mean, we should have all reasonable inferences drawn in our favor. And it seemed, and that's, throughout the decision, it seems to almost have been things were weighed against the landscape that shouldn't have been. I mean, at the time, the HR manager, Ms. Weddle, gave her a written counseling, which the Veterans Administration wants to argue is not even disciplined. We would counter, you know, say, yes, it is. At the time she did it, she remarked in her written assessment that this is the second time you've shown a lack of professional judgment. The other one was with this wage four job last year. Had never had any problem with the wage four job last year. I'd never heard that that was even a problem. So, the reasoning seems to be completely made up. The reason for the discipline. And it comes after the VA has knowledge of her EEO charges she has now filed. And those dates are in my brief as well. Mr. Allman, you reserved five minutes for rebuttal. We're a little bit into that. Do you want to hold at this point and respond to what your adversary has to say? Thank you very much. I will reserve. Okay, very well. Thank you. Mr. Kirkland, good morning. Good morning. Do I try to leave this on or may I take it off? At your pleasure. Thank you. You can take it off or leave it on. Looks like you got the vaccination sticker on. Can I begin? Yeah, absolutely. Good morning, Your Honor. May it please the court. My name is Taylor Kirkland, Assistant United States Attorney. I represent the United States of America, the Department of Veterans Affairs in this appeal. This court's established precedent resolves this case. Ms. Scape was not subjected to a hostile work environment by a one-time racial slur said by a coworker, which she did not hear and which she only learned about seven months after the fact. That result is true even if that one-time slur is aggregated with the alleged conduct by her supervisor, Gavin Earp. Ms. Scape was not subjected to retaliation by a written counseling email. This court's decision in Sweeney v. West throws that argument out the window. And finally, Ms. Scape was not constructively discharged when she voluntarily accepted another job at a different VA facility with no reduction in pay, no gap in her service and in her words in order to take a better opportunity elsewhere. I want to address a few things that Mr. Allman... Before you do that, can I go back to one of the points you made in the very beginning? It's a point that troubles me here, and that is, you know, you articulate it in your brief just fine, but I'm not sure that it's right, and that is why should we view Chief Fogg as a coworker or a peer? I understand that he's not her supervisor, but why, from that observation, should we go all the way to the point of concluding that she's effectively a peer? I think there are two reasons for it. One is in Nichols, so Nichols provides the almost exact same fact pattern there. There you have a managerial employee who is not within the chain of command for the plaintiff, and this court regards that employee as a coworker. So Nichols sort of lays the framework there. But more to the point, the Supreme Court's decision in Vance, the reasoning there makes clear that the logic for the increased liability standard, the vicarious liability standard for an employer is premised on the idea of the threat of discipline that that supervisor who's within the supervisory chain can inflict on an employee. So remember that hostile work environment in the race context evolves out of the sexual harassment context, and we may assume that employees who are under the supervision of a harasser feel compelled not to report that harassment simply because of the threat of punishment. But here we cited in our brief Ms. Scaife's responses to requests for admission that were produced in discovery, and here we have no supervisory authority by Chief Fogg over Ms. Scaife whatsoever. So there's no threat of discipline there. Could Chief Fogg's position add to the severity of the conduct as perceived by Ms. Scaife? So to take Judge Scudder's point, he's not her direct supervisor, but he's certainly a person at that VA Medical Center with some cachet in his position. He's Chief of Police Services, and she has to service his department because she has to classify his superiors. So he sounds like he's a repeat player that she comes across. And so hearing this epithet from him, it could increase the severity of it for her. And as the other counsel noted, we are to draw inferences in her favor at this summary judgment stage. I think under a different fact pattern, that could be significant. But here Ms. Scaife's testimony doesn't indicate that she saw Chief Fogg as an authority figure. There's no indication that she was deferential to him. And once she learned about this epithet, she immediately reported it. I mean, there's no indication in the record that she felt dissuaded because of his position of authority from reporting this harassment. So the logic of that vicarious liability standard that's been articulated by the Supreme Court really just does not hold under the facts of this particular case. So can you, let's move away from the facts here for a second, and let's suppose that the individual that made the statement was an executive vice president. Then what? So that's. Because I think the CEO is too easy of an example. The president or CEO is too easy. Yes, Your Honor. So somebody that's essentially in the executive suite of the VA. So we would have, well, I think this would be a very different case if this were upper-level management who was someone within Ms. Scaife's supervisory chain. The Judge Kavanaugh's concurrence in Aesi Ito would suggest that a one-time racial epithet vice, I believe was a vice president in that case, would trigger automatic employment liability. But here what we have are a completely separate set of facts that have been conclusively admitted in discovery that Chief Fogg was not within that supervisory chain and had no such authority. So really the facts of this case just do not lend themselves to imposing liability on the VA under that framework. I'm happy to take any other questions that the panel might have, but I think that our position is articulated in our brief, and we're happy to rest on our brief if there are no other questions. Thank you. Okay, very well. Mr. Allman, we'll return to you. The federal employer, as an employer, has to display the highest level of adherence to our laws. The chief of police, he's one of 23 service chiefs that are just underneath three executive managers of the VA facility, very high. So Mr. Allman, can I respond on that? You know what, let's suppose you're right. I think you got a pretty good argument on that. What does the summary judgment record show between the, what is it, the February 2016 meeting, which, you know, this comment is made, terrible statements made, and the plaintiff escaped learning about it in September. And my question is very specific. Does the record show that in between those dates, even with the benefit of hindsight, that she looks back at that period of time and says, you know what, now that I know about it, it explains X, it explains Y, it explains Z, there was some racial tension, there was some, you know, conduct, there were some things that happened to me that now I can actually trace back to having now learned that Chief Fogg made that comment. Is there anything like that in the record? No. Okay, and what if any consequence follows from that? Well, the consequence was immediate and disturbing when she learned it. I mean, that's her, her hostile work environment didn't exist until she learned about this. At the same time, all the other African American employees in the facility are hearing that. Right, so the, okay, and that's what I took. So the position is that it becomes severe and pervasive, or severe or pervasive, instantaneously upon learning of it. Yes, sir. Because of, you know, the nature of the statement, the harm of the statement? What the chief said about her work performance in evaluating that position, and also the attack from her boss to violate law and give his friend a higher labor grade, was an attack on her professional integrity. And that is something that she, Elaine Scaife is a straight shooter by the book, we're gonna do it right, and she doesn't deviate from that. And when these two incidents exploded her world, she was devastated. And she experienced this sort of hellish, hostile work environment, then given a written warning, and then here's the chief of police, CC'ing her on a email to the HR person about a job. She had all she could take. She got out of there. She has become the subject matter expert in the National VA for job classification since she left. She works now in the LA Phoenix VA system. Counsel, is your argument for constructive discharge then, which of the two prongs there, that her environment had become so unbearable, she felt she had to leave, or that she saw the writing on the wall? She- And feared being fired. The first, the former. Yeah, it became intolerable for her. So we would pray that this case go back to Indianapolis for a trial by jury, your honors. Thank you very much. You're quite welcome. Thanks to both counsel, the case will be taken under advisement.